UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BETTY DIANE CARROLL | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-327-SDJ |
| | § | |
| C-CON SERVICES, INC., ET AL | § | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Betty Diane Carroll brought suit against Defendants C-Con Services, Inc. and Earl B. Cotton, alleging violations of the Fair Labor Standards Act. Following a one-week trial, the jury returned a verdict in favor of Carroll, concluding that C-Con had willfully failed to pay Carroll overtime wages, and that C-Con had retaliated against Carroll due to her requesting that she be paid overtime. For these injuries, Carroll was awarded damages in the amounts of $139.99 in unpaid overtime and $4,848.00 in back pay.

Carroll now moves for judgment as a matter of law, requesting that the Court award her $42,816.02 on her overtime claim and $85,400.00 in back pay damages, notwithstanding the jury's verdict awarding lesser amounts. (Dkt. #73). In the alternative, Carroll requests that the Court either impose an additur to the jury's verdict in the amounts referenced above, or that the Court grant her request for a new trial to enable the jury to redetermine the damages owed to her. Finally, Carroll moves for liquidated damages and front pay, requesting $139.99 in liquidated damages and $158,266.00 in front pay damages. (Dkt. #72).

For the following reasons, the Court will grant in part both motions.

# I. FACTUAL BACKGROUND

Betty Carroll began her employment with C-Con Services, Inc. on July 27, 2009, and she worked in various accounting-related roles with C-Con for over a decade. While Carroll's relationship with C-Con management—including C-Con owner and president Earl B. Cotton—was largely positive throughout Carroll's tenure at the company, this began to change following the installment of Amy Sewell as Carroll's direct supervisor in December 2019. Further straining Carroll's relationship with various C-Con management was the arrival of COVID-19 and the attendant difficulties imposed by the pandemic.

On February 5, 2021, Carroll received her first official "employee warning notice" from Sewell. Sewell discussed this warning notice with Carroll in a formal meeting held that same day, with Sewell apprising Carroll that she was concerned with Carroll's "[i]ncreased instances of data entry errors, reduction in satisfactorily managing job duties, failure to timely comply with requests for information and/or documents, [and] unwillingness to cooperate on team projects." Also discussed in the warning meeting was Sewell's continued frustration with Carroll's practice of contacting upper-level management with questions and concerns without first contacting Sewell. The warning notice itself set out a multi-step plan that Carroll was required to comply with towards correcting the above-identified deficiencies, admonishing Carroll that failure to comply with the warning's commands would "result in further disciplinary action up to and including termination." Carroll was given 60 days to comply with the warning and Sewell's instructions, and a follow-up

meeting was scheduled for April 9, 2021. (Dkt. #66, Plaintiff's Exhibit 7). Both Carroll and Sewell signed the warning notice at the conclusion of this initial meeting.

Before the follow-up meeting and in contravention of Sewell's instruction to bring complaints and requests through her chain of command, on March 2, 2021, Carroll directly emailed Earl Cotton requesting that Cotton pay Carroll for unpaid overtime hours allegedly dating back to 2015. (Dkt. #66, Plaintiff's Exhibit 22). This demand apparently was grounded in a prior audit of C-Con by the United States Department of Labor ("DOL") in 2015, which resulted in a DOL determination that, although C-Con had characterized Carroll as being a "salaried" employee, she was nonetheless entitled to overtime wages for any work performed in excess of forty hours per week. The 2015 DOL determination required C-Con to pay Carroll $4,018.18 for unpaid overtime that the DOL calculated that Carroll had worked between May 11, 2013, and May 9, 2015. (Dkt. #66, Plaintiff's Exhibit 18). Following the 2015 DOL report, C-Con responded by fixing the hours for all overtime-eligible employees at forty hours per week, further requiring that any overtime outside of the set forty hour schedule must be preapproved. (Dkt. #66, Plaintiff's Exhibit 37). In her March 2, 2021, email to Cotton, however, Carroll claimed to have worked between two-and-a-half to five hours per week in overtime each week from 2015 through 2021, even though no such overtime had been theretofore requested or approved.

Upon receipt of this email, Cotton forwarded the message to Sewell, with Cotton and Sewell ultimately concluding that Carroll should be given a second "employee warning notice." Sewell texted Carroll that same day and requested that

Carroll bring in her C-Con laptop the following day, March 3, 2021. On March 3, 2021, Cotton, Sewell, and C-Con vice president Richard Linnebur met with Carroll to discuss Carroll's second employee warning notice, this time specifically reprimanding Carroll for "insubordination" and for a failure to "[f]ollow verbal and written problem resolution procedures." (Dkt. #66, Plaintiff's Exhibit 16). Carroll did not sign this notice, and Sewell testified that Carroll refused to answer any questions or to otherwise participate in the meeting. Following this interaction, the decision was made to terminate Carroll, with Carroll being fired that day. (Dkt. #66, Plaintiff's Exhibit 17).

## II. PROCEDURAL BACKGROUND

In response to being terminated, on March 17, 2021, Carroll brough the instant suit against C-Con and Cotton in the 431st Judicial District Court in Denton County, alleging that C-Con and Cotton failed to pay her required overtime and fired her in retaliation for requesting overtime, all in violation of the Fair Labor Standards Act ("FLSA").

Specifically, Carroll asserted that C-Con and Cotton were both "employers" of Carroll under the FLSA, and that although the DOL had previously characterized Carroll's position as one requiring overtime, Carroll was nonetheless instructed "to work whatever hours [she] wished but not to write down more than 40 hours in a week for purposes of the time card" she was obligated to keep. Carroll further alleged that in her final week working for Defendants, Amy Sewell "changed [Carroll's FLSA] classification" from non-exempt to exempt, and that in addition, Sewell required her "to work more time to make up for time lost due to the historic [2021] ice storm in the

DFW area," resulting in Carroll working even more overtime. Finally, Carroll alleged that she was impermissibly retaliated against for requesting overtime pay, evidenced by the fact that she was fired the day after she emailed Cotton requesting overtime going back to 2015. Based on these alleged injuries, Carroll requested attorney's fees, court costs, statutory interest, liquidated damages, back pay and front pay.

Defendants removed the case to this Court on April 23, 2021, invoking the Court's federal question jurisdiction, given that Carroll's claims arose under the FLSA. Upon completion of discovery, no dispositive motions were filed by either side, although leading up to trial, Defendants sought leave to file a second amended answer, which included an affirmative defense that Carroll was an administratively exempt employee under the FLSA. The Court denied Defendants motion for leave and struck their second amended answer from the record, concluding that Defendants failed to satisfy the "good cause" standard required under Federal Rule of Civil Procedure 16(b) for the amendment of pleadings outside of the time prescribed by the Court's scheduling order.[1]

The case was tried over a period of five days, from September 12, 2022, to September 16, 2022, and the jury returned a verdict on September 19, 2022. As to Carroll's overtime and retaliation claims, the jury found that Defendant C-Con

---

[1] While the Court denied Defendants' motion for leave to plead the administrative exemption affirmative defense, the Court ultimately concluded that the parties had tried this issue by consent through their conduct at trial, such that the issue of whether Carroll was in fact an administratively exempt employee was put before the jury. The jury ultimately concluded that Carroll was not an exempt employee under the FLSA, such that Carroll was indeed owed overtime for all hours worked in excess of forty hours per week.

Services, Inc. was liable.[2] Specifically, the jury concluded that Carroll had proven by a preponderance of the evidence that C-Con had failed to pay Carroll required overtime in the amount of $139.99, and that because of C-Con's retaliation in terminating Carroll for requesting overtime, C-Con was liable for $4,848.00 in back pay damages. (Dkt. #69).

Carroll takes issue with the jury's verdict, and now moves for judgment as a matter of law, additur, or new trial, as well as liquidated damages and front pay. In Carroll's view, the "undisputed evidence" shows that she is entitled to $42,816.02 in unpaid overtime, $85,400.00 in FLSA retaliation damages, $139.99 in liquidated damages, and $158,266.00 in front pay damages. Carroll also requests post-judgment interest on all amounts awarded through this suit. In response, C-Con counters that it adduced extensive evidence throughout the course of the trial which supports the jury's verdict, such that Carroll's requests for relief should be denied.

### III. LEGAL STANDARDS

#### A. Judgment as a Matter of Law

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (quotation omitted). In ruling on a posttrial motion for judgment as a matter of law, the Court is "especially deferential to the verdict." *Mays v. Chevron Pipe Line Co.*, 968 F.3d 442,

---

[2] The jury determined that, in his individual capacity, Defendant Cotton was not an "employer" of Betty Carroll as that term is defined under the FLSA, thereby relieving Cotton of any individual liability. (Dkt. #69 at 1).

447 (5th Cir. 2020) (quotation omitted). The Court must "review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; [it] may not make credibility determinations or weigh the evidence, as those are jury functions." *Brennan's Inc v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). "A jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (quotation omitted).

## B. New Trial

Pursuant to Rule 50, a party may include an alternative request for a new trial under Rule 59. FED. R. CIV. P. 50(b). The Court may grant a motion for new trial under Rule 59 if the verdict is against the great weight of the evidence, the damages awarded were excessive, the trial was unfair, or prejudicial error was committed. *Adams v. Ethyl Corp.*, 838 F.App'x 822, 827 (5th Cir. 2020) (citing *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991)). Additionally, if the jury's verdict on liability demonstrates "evidence of influence by passion [or] prejudice . . . then a complete new trial [is] necessary." *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir. 1985) (per curiam) (citations omitted). The decision to grant or deny a new-trial motion is committed to the Court's sound discretion. *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 230 (5th Cir. 2020).

## C. Additur

Rule 59(e) permits motions to alter or amend judgment for the narrow purpose of allowing a party "to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)

(quoting *Keene Corp. v. Int'l Fidelity Ins. Co.,* 561 F.Supp. 656, 665 (N.D. Ill. 1982), *aff'd,* 735 F.2d 1367 (7th Cir. 1984) (quotation marks omitted)). "As a general matter, the Supreme Court has held that . . . remittur [sic] withstands Seventh Amendment attack, while proposing the opposite bargain, known as additur, is unconstitutional." *Roman v. W. Mfg., Inc.,* 691 F.3d 686, 701 (5th Cir. 2012) (simplified) (quoting *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)). Whereas "remittitur has the effect of merely lopping off an excrescence," an additur is "a bald addition of something which in no sense can be said to be included in the verdict." *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935). However, "the constitutional rule against additur is not violated in a case where the jury has properly determined liability and there is no valid dispute as to the amount of damages. In such a case the court is in effect simply granting summary judgment on the question of damages." *Roman*, 691 F.3d at 702 (simplified).

**D. Liquidated Damages**

An employer who is found to have violated the FLSA "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Only if an employer sustains the "substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith *and* predicated upon reasonable grounds" may a district court exercise its discretionary authority to reduce or eliminate a liquidated damages award. *Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1030 (5th Cir. 1993) (simplified)

(referencing Section 216's statutory exception, 29 U.S.C. § 260, and quoting *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990)). An employer is not relieved of its liquidated damages burden simply because lower-level employees are responsible for the violation, and neither does ignorance of the requirements of the FLSA provide any shelter from liability. *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1263 (5th Cir. 1986) (quoting *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 827–28 (5th Cir. 1973); *Barcelona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468–69 (5th Cir. 1979)).

**E. Front Pay**

"Front pay . . . is intended to compensate the plaintiff for wages and benefits he would have received from the defendant employer in the future if not for the discrimination." *Julian v. City of Houston*, 314 F.3d 721, 729 (5th Cir. 2002). The front pay period begins following judgment and runs through reinstatement, or for some period in place of reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) ("Although courts have defined 'front pay' in numerous ways, front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.").

The award of front pay "is an equitable remedy and therefore the court, not the jury, determines the amount of the award." *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991) (citing *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 823 (5th Cir. 1990)). The determination of the appropriate front pay award is a

"prospective and necessarily speculative" exercise. *Reneau*, 945 F.2d at 870 (citations omitted). Therefore, the Court "must employ intelligent guesswork to arrive at the best answer." *Id.* When calculating front pay, courts should "consider the length of prior employment, the permanency of the position held, the nature of work, the age and physical condition of the employee, possible consolidation of jobs and the myriad other non-discriminatory factors which could validly affect the possible . . . post-discharge employment relationship." *Id.* at 871. The court must then determine "whether any front pay award is equitably required and, if so, for what period of time such pay should be granted." *Id.*

## IV. Discussion

### A. Judgment as a Matter of Law

Carroll first argues that she is entitled to judgment as a matter of law on the issues of FLSA back pay and retaliation damages. Judgment as a matter of law is permissible only if, after "a party has been fully heard on an issue during a jury trial . . . the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). However, a party moving for renewed judgment as a matter of law under Rule 50(b) may not use that motion "to assert a ground that was not included in the original motion." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019) (simplified) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985)). The pre-verdict motion for judgment as a matter of law must concern the same issues "as the renewed motion after the verdict under Rule 50(b)." *Roman*, 691 F.3d at 699. "This ensures

that the opposing party is alert 'to the specific grounds for an anticipated challenge to the sufficiency of its proof' and allows that party 'the opportunity to move to cure any such deficiency.'" *Id.* at 699–700 (quoting *United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 963 (5th Cir. 1998)).

Here, Carroll's original motion for judgment as a matter of law concerned only "the issue of the affirmative defense of administrative exemption," and did not address FLSA back pay or retaliation damages. (Dkt. #58 at 3). Therefore, the Court will deny Carroll's motion for judgment as a matter of law.[3] *See Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 247 (5th Cir. 2005) ("If a party fails to raise an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion.").

## B. New Trial & Additur

In the alternative to judgment as a matter of law, Carroll requests that the Court either grant her a new trial on the issue of overtime and retaliation damages, or instead permit an additur award to conform the jury's verdict with what Carroll alleges is the "undisputed evidence" proven at trial. The Court will deny both requests.

---

[3] In addition, for all the reasons discussed *infra* Section III.B, as the Court is denying Carroll's motion for new trial and additur on the merits, *a fortiori*, even if Carroll had raised the issue of damages in her pre-verdict motion for judgment as a matter of law, this motion would nonetheless be denied on the merits as well. *See Goonewardena v. New York State Ins. Fund*, No. 1:01-CV-9706, 2003 WL 21305356, at *3 (S.D.N.Y. June 5, 2003) ("Where, as here, the movant has failed to satisfy the standard for a new trial, the movant has failed *a fortiori* to meet the heavier standard for judgment as a matter of law.").

### i. FLSA Overtime Claim

As noted above, a new trial will be granted only where the verdict is against the great weight of the evidence, the damages awarded were excessive, the trial was unfair, or prejudicial error was committed. Carroll's principal argument in this regard concerning her FLSA overtime claim is that the verdict is against the great weight of the evidence, as Carroll asserts that "[t]he only evidence offered" in support of her claimed unpaid overtime wages was a "best estimate" figure that Carroll introduced at trial. Carroll further argues that C-Con "did not offer any separate calculation or substantially explore different calculations with [Carroll] during trial." C-Con responds that it did indeed dispute Carroll's alleged overtime figures through the introduction of its own exhibits, as well as through the testimony of two of its own witnesses. C-Con contends that the verdict reflects the jury's proper resolution of the parties' competing positions.

The Court concludes that the jury's FLSA overtime verdict is supported by the evidence adduced at trial. In the first instance, the Court rejects Carroll's argument that her overtime evidence was "undisputed." Indeed, both Carroll and C-Con introduced the same exhibit, an email titled "Recap on Today's Meeting About Timesheets and Schedules," that explicitly states that all overtime must be preapproved. (Dkt. #66, Plaintiff's Exhibit 37); (Dkt. #67, Defendants' Exhibit 9). Carroll points to no evidence showing that any of her claimed overtime was preapproved. Instead, Carroll argued to the jury, primarily through live testimony and the submission of work emails sent outside of her scheduled hours, that even

though she never received official pre-approval to work overtime, C-Con was aware that she had been coming into work outside of and in addition to her scheduled hours, such that C-Con should be charged with overtime liability. *See Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) ("An employer who is armed with knowledge that an employee is working overtime cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." (simplified) (quoting *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).

The weight of the evidence, however, does not compel Carroll's desired conclusion that she worked several hours of overtime each week for the three years preceding her termination.[4] Given the testimony of C-Con's witnesses that Carroll worked no overtime for C-Con during the relevant period, in addition to the vast number of time sheets Carroll submitted herself that reflect no overtime worked at all, a reasonable jury could easily conclude that Carroll failed to prove by a preponderance of the evidence that she is entitled to the substantial sums of overtime she now demands. Indeed, it appears that the jury reached its verdict of $139.99 in overtime damages by multiplying the 3.08 hours of overtime reported on Carroll's time sheet for the work week starting February 22, 2021, by the overtime pay rate

---

[4] As the jury found that C-Con either "knew that its . . . conduct was prohibited by the FLSA" or otherwise "showed reckless disregard for whether the FLSA prohibited its . . . conduct," (Dkt. #69 at 2), the relevant overtime damages period extended back three years preceding Carroll's termination. 29 U.S.C. § 255(a).

supplied by Carroll at trial in the amount of $45.45 per hour.[5] As such, the jury's finding of damages as to Carroll's overtime claim is not against the great weight of the evidence, and accordingly, Carroll's motion for a new trial on overtime damages will be denied.[6] *Espey v. Monsanto Co.*, 189 F.3d 467, 1999 WL 511458, at *1 (5th Cir. 1999) (per curiam) ("Because the jury's verdict was not against the great weight of the evidence, the district court did not abuse its discretion in denying Espey's motion for new trial.").

### ii. FLSA Retaliation Claim

Separately, Carroll argues that the jury impermissibly awarded insufficient back pay damages on her FLSA retaliation claim. Similar to her overtime claim arguments, Carroll asserts that C-Con "presented no evidence whatsoever about the damages" Carroll suffered, and that therefore, "the only evidence of damages before the jury was [Carroll's] un-contradicted testimony that she lost $85,400 in wages, and $20,000 in benefits." Carroll contends that there "is no evidence whatsoever to support the jury finding that [Carroll] only lost $4,848 as a result of Defendant C-Con's violation of the FLSA." C-Con responds that there is legally sufficient evidence

---

[5] 3.08 hours x $45.45 / hour = $139.986.

[6] As the Court concludes that the jury's verdict on overtime damages is well-supported by the evidence, such that a new trial is not warranted, it will similarly deny Carroll's request for additur. *See Hawkes v. Ayers*, 537 F.2d 836, 837 (5th Cir. 1976) (per curiam) ("It is well-settled, however, that the Seventh Amendment prohibits the utilization of additur, at least where the amount of damages is in dispute."); *see also Alexander v. Servisair, LLC*, 593 F.App'x 352, 354–55 (5th Cir. 2014) (per curiam) ("Because the jury was presented with evidence that could lead it reasonably to conclude that [the plaintiff's] lost wages were the result of her violating a no-call/no-show policy and not the result of any interference, the amount of damages was subject to a valid dispute and was not eligible to be increased by the identified additur exception.").

in the record to support the jury's verdict. C-Con argues that the jury likely relied on Carroll's evidence that she was earning $1,212 per week at the time of her termination on March 3, 2021, and that the jury capped Carroll's back pay period at four weeks following her termination in light of the evidence C-Con introduced concerning Carroll's declining performance, employee warning notices, and the follow-up meeting that was scheduled to take place concerning Carroll's declining performance on April 9, 2021.

As a general matter, in the retaliation context, the back pay period begins on the date of an employee's wrongful discharge and continues until the date of judgment. *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 482–83 (5th Cir. 2007) (observing in the ADEA context that "[i]n general, back pay liability in a wrongful termination case commences from the time the discriminatory conduct causes economic injury and ends upon the date of the judgment." (citations omitted)); *see also Johnson v. Martin*, 473 F.3d 220, 222 (5th Cir. 2006) (per curiam) ("The FLSA and ADEA have the same remedies provisions, so this ADEA precedent applies in the present case [dealing with FLSA retaliation claims]."). However, "[t]he determination of the proper period for awarding back pay is a factual matter that should be set aside only if clearly erroneous." *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 401 (5th Cir. 2002); *see also Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 n.5 (5th Cir. 1992) (observing that "this Circuit recognizes that the determination of back pay period is a factual matter to be set aside only when clearly erroneous.").

Back pay is intended to place the plaintiff in the same economic position she would have been in absent the discrimination; back pay does not afford the plaintiff a windfall recovery. *Id.* When assessing all of the evidence presented, even if the jury concludes that the plaintiff was impermissibly retaliated against, the jury is nonetheless permitted to determine that the plaintiff would have been fired at some point before judgment is rendered, and so limit the back pay period. *Reich v. Davis*, 50 F.3d 962, 966 (11th Cir. 1995) (holding that, in the context of an FLSA retaliation case, "[i]f [plaintiffs] establish that they would not have been fired at all but for their protected activities, then they are entitled to reinstatement and full back pay," but that, "[b]y contrast, if the evidence establishes that [plaintiffs] eventually would have been fired anyway, but not as soon as they were, then they are not entitled to reinstatement; they are entitled only to back pay for the period of time that they would have been employed but for their protected activity."); *cf. Aguinaga v. United Food & Com. Workers Int'l Union*, 993 F.2d 1463, 1473 (10th Cir. 1993) (holding that, in the context of a Labor Management Relations Act case, "[i]t is improper, however, to award back pay if it can be shown that the employees would have lost their jobs at a later date even if they had been treated fairly"); *Ackerman v. Western Elec. Co.*, 643 F.Supp. 836, 854 (N.D. Cal. 1986) (holding that, in the context of a California Fair Employment and Housing Act case, "[a] wrongfully terminated employee is not entitled to back pay for a period when he or she would not have been on the job in any event for a reason unrelated to the unlawful conduct of the employer").

As detailed above, there was ample evidence in the record for the jury permissibly to determine that Carroll would have been terminated well before judgment was reached in this case, such that the jury's back pay award was not "clearly erroneous." C-Con submitted numerous emails detailing Carroll's increasingly deficient work performance going back to April 2020, as well as the testimony of two C-Con employees, Amy Sewell—Carroll's direct supervisor during the relevant period—and Defendant Earl B. Cotton—C-Con owner and president—that further affirmed Carroll's declining performance. (Dkt. #67, Defendants' Exhibits 15, 17, 20, 22, 25, 26). In addition, Carroll's initial employee warning notice stated that Carroll's failure to comply with the warning's commands would "result in further disciplinary action *up to and including termination*," with a follow-up meeting having been scheduled for April 9, 2021. (Dkt. #66, Plaintiff's Exhibit 7) (emphasis added). And before the April 9, 2021, meeting could occur, Carroll escalated the tensions between her and C-Con management by way of the March 2, 2021, overtime demand letter Carroll sent directly to Defendant Earl B. Cotton instead of Carroll's direct supervisor, Amy Sewell, in contravention of the communication hierarchy Carroll was obligated to comply with. The demand letter was followed by a second formal employee warning notice and meeting, with Carroll declining to participate in the meeting in any meaningful capacity. This evidence, all of which was presented to

the jury, was more than sufficient to support the jury's verdict limiting Carroll's back pay period, such that the proper measure of back pay damages was $4,848.[7]

Accordingly, Carroll's motion for new trial on the issue of back pay will be denied.[8]

## C. Liquidated Damages

Carroll also argues that she is entitled to liquidated damages in the amount of $139.99 as a doubling of the jury's overtime award. Liquidated damages are statutorily prescribed: "Any employer who violates the provisions of [the relevant FLSA overtime statute] shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). As noted above, in order to escape liability for liquidated damages, C-Con is tasked with establishing that its failure to pay Carroll required overtime was nonetheless done "in good faith *and* [was] predicated upon reasonable grounds." *Tiller Helicopter Servs., Inc.*, 8 F.3d at 1030

---

[7] To the extent Carroll argues that her back pay award also failed properly to account for benefits, this argument fails, as the record is devoid of any evidence showing that Carroll actually incurred any post-termination expenses relating to her own provision of the claimed benefits, a necessary precondition for benefit recovery. *Brunnemann*, 975 F.2d at 179–80 (rejecting plaintiff's claim to benefits in the form of dental insurance premiums and the face value of a life insurance and accidental death policy as plaintiff "failed to provide evidence of any out-of-pocket expenses paid for dental services which he incurred because he no longer had dental insurance," and likewise failed to present evidence that plaintiff "incurred expenses for substituted [life insurance] coverage"); *see also Lubke v. City of Arlington*, 455 F.3d 489, 499 (5th Cir. 2006) ("The lost 'value' of benefits, absent actual costs to the plaintiff, is not recoverable.").

[8] As the Court concludes that the jury's verdict on back pay damages is well-supported by the evidence, such that a new trial is not warranted, it will similarly deny Carroll's request for additur. *See supra* note 6.

(simplified). In seeking to meet this burden, C-Con argues that it "introduced evidence that [it] believed it acted in compliance with the FLSA," and that accordingly, it "acted in good faith in its belief that it was not in violation of the FLSA," such that liquidated damages should not obtain.

The Court concludes that Carroll is entitled to liquidated damages in the amount of $139.99. This is because the Fifth Circuit has squarely held that where a jury has found that a defendant willfully violated the FLSA, liquidated damages are required. *Singer v. City of Waco*, 324 F.3d 813, 823 (5th Cir. 2003) ("In this case, the jury found the City's actions to be willful. As a result, the City could not show that it acted in good faith. Thus, the district court did not abuse its discretion in assessing liquidated damages."); *see also Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (holding that "violations under the FLSA are willful if the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute'" (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)). Therefore, the Court will grant Carroll's motion for liquidated damages in the amount of $139.99.

## D. Front Pay

Carroll also asserts that the Court should award her front pay damages, as reinstatement is not feasible. In this regard, Carroll requests that the Court award her two years of front pay in the amount of $158,266.00. C-Con responds that Carroll should not be awarded any front pay, as it asserts that "evidence in the record proves that [Carroll's] employment would not have continued past April 9, 2021," which was

the originally scheduled date for Carroll's follow-up meeting with C-Con management concerning her initial employee warning notice.

As noted above, front pay is an equitable remedy within the discretion of the Court to award based on a number of factors, including any "non-discriminatory factors which could validly affect" C-Con's continued employment of Carroll absent C-Con's impermissible retaliatory firing. *Reneau*, 945 F.2d at 871; *see also Weil v. Citizens Telecom Servs. Co.*, No. 2:15-CV-835, 2019 WL 5862965, at *3 (W.D. Wash. Nov. 8, 2019) ("Courts limit claims for back pay or front pay made by an employee who succeeds on the merits of their discrimination claims where the employee would have been subsequently terminated for lawful or non-discriminatory reasons."); *Dillon v. West Publ'g Corp.*, No. 3:03-CV-203, 2008 WL 11451152, at *4 (D. Nev. May 15, 2008) (holding that "there is nothing contradictory in finding that Plaintiff was entitled to back pay but not to front pay, and as such, the verdict has made the plaintiff whole"). Consistent with the jury's damages verdict on back pay, the Court concludes that Carroll is not entitled to any front pay. It is plain from the jury's back pay award that it found that Carroll would have been permissibly terminated by C-Con well before judgment was reached at trial, and the Court sees no reason to depart from that finding.

In reaching this conclusion, the Court appreciates that Carroll was employed by C-Con for over a decade, that C-Con and Carroll had previously discussed having Carroll work until she turned 70, and that throughout the course of her employment with C-Con, Carroll received several positive performance reviews. However, as noted

above in connection with the jury's back pay award, there is significant evidence in the record that, beginning in April 2020, Carroll's work performance began appreciably to decline. This marked decline was documented in numerous C-Con emails showing that Carroll was increasingly making data entry errors—such as by failing to post outstanding balances due as well as posting certain balances twice, risking double payment—as well as Carroll's continued practice of contacting upper management directly without following the established communication hierarchy C-Con required her to follow. And this was all confirmed by extensive testimony from both Amy Sewell and Earl B. Cotton at trial. In addition, the only evidence in the record concerning Carroll's compliance with the action items listed in her initial employee warning notice shows that Carroll was continuing to fail to meet expectations. Therefore, it appears to the Court that, even without any impermissible retaliation, Carroll would have been terminated by no later than the April 9, 2021, follow-up meeting.

For these reasons, the Court will deny Carroll's request for front pay.

## E. Post-Judgment Interest

Finally, Carroll argues that she is entitled to post-judgment interest on her jury award pursuant to 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," with said interest being calculated "from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[]

the date of the judgment." C-Con appears to concede this point, as it declined to argue against Carroll's request for post-judgment interest. C-Con's silence is understandable, given the clear statutory language cited above, as well as binding Fifth Circuit precedent. *See, e.g., Reeves v. Int'l Tel. & Tel. Corp.*, 705 F.2d 750, 751–52 (5th Cir. 1983) ("However, once the total liability, including damages, is fixed by judgment, there is no reason to distinguish FLSA judgments from other claims. 'Interest shall be allowed on any money judgment in a civil case recovered in a district court,' commands 28 U.S.C. § 1961.").

Therefore, the Court will grant Carroll's request for post-judgment interest. For the week preceding judgment, ending September 16, 2022, the weekly average 1-year constant maturity Treasury yield was 3.91%.[9]

## V. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Carroll's Motion to Enter Judgment as a Matter of Law as to Damages Consistent with the Evidence Adduced at Trial, (Dkt. #73), is **GRANTED in part**. It is **ORDERED** that post-judgment interest on all amounts awarded to Carroll through this suit is set at 3.91%. It is further **ORDERED** that all other relief Carroll seeks through this motion is **DENIED**.

It is further **ORDERED** that Carroll's Motion for Liquidated Damages and Front Pay, (Dkt. #72), is **GRANTED in part**. It is **ORDERED** that Carroll is

---

[9] *See Post Judgment Interest Rates*, United States District Court for the Northern District of Texas. [https://perma.cc/QX8C-UUYH].

entitled to $139.99 in liquidated damages. It is further **ORDERED** that all other relief Carroll seeks through this motion is **DENIED**.

The Court will enter a Final Judgment by separate order.

**So ORDERED and SIGNED this 1st day of September, 2023.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE